# EXHIBIT E

# Dames v. United States Ctr. for SafeSport

United States District Court for the Northern District of Illinois, Eastern Division

January 5, 2026, Decided; January 5, 2026, Filed

NO. 1:25-CV-03503

**Reporter**
2026 U.S. Dist. LEXIS 657 *; 2026 LX 33317; 2026 WL 20793

RORY DAMES, Plaintiff, v. U.S. CENTER FOR SAFESPORT, Defendant.

**Prior History:** *Dames v. United States Ctr. for Safesport, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744 (May 7, 2025)*

**Counsel:** **[*1]** For Rory Dames, Plaintiff: Susan Bogart, LEAD ATTORNEY, Law Offices of Susan Bogart, Chicago, IL; Patrick Edward Deady, Schoenberg Finkel Beederman Bell Glazer LLC, Chicago, IL.

For U.S. Center for SafeSport, Defendant: Cameron T Liljestrand, Lewis Brisbois Bisgaard & Smith Llc, Chicago, IL.

**Judges:** Honorable Edmond E. Chang, United States District Judge.

**Opinion by:** Edmond E. Chang

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff Rory Dames was suspended from professional soccer coaching by the United States Soccer Federation after an investigation into his eligibility as a coach was opened by the United States Center for SafeSport. Dames brought this lawsuit against the Center to challenge its authority and the procedures used to investigate the various allegations against him. R. 34, Am. Compl.[1] He alleges that the policies employed by the Center in its adjudicative process violate the Ted Stevens Amateur Sports Act, the SafeSport Act, the Center's own policies, and Illinois common law. *Id.* ¶¶ 87-92, 106-21. He seeks monetary damages and injunctive relief in connection with what he contends is a violation of his statutory due process rights. *Id.* at 23-27. This comes after the Court dismissed Dames's first complaint, **[*2]** concluding that his claims were preempted and that he had not yet exhausted his arbitrative remedies. *See* *Dames v. U.S. Ctr. for Safesport, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *1, *6-7 (N.D. Ill. May 7, 2025)*.

Dames has now amended his complaint, and the Center once again moves to dismiss the case under *Civil Rule 12(b)(6)*. *See* R. 41, Def.'s Mot. The Center argues that Dames's claims are preempted by the pertinent statutory framework and that he has failed to state a claim for relief. The Court agrees, and the amended complaint is dismissed, this time with final judgment to be entered.

### I. Background

---

[1] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. This Court has jurisdiction over this matter because it is a civil action originally brought in the Illinois state court against the Center and was thus removable to the district court under the *SafeSport Act, 36 U.S.C. § 220541(d)(3)(A)*.

The allegations underlying this lawsuit are drawn from the amended complaint and its attached exhibits. *See generally* Am. Compl. In deciding a motion to dismiss, the Court accepts well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*.

**A. The Statutory Framework**

As the Court explained in its prior Opinion, this case involves Title 36 of the U.S. Code, entitled Patriotic and National Observances, Ceremonies, and Organizations. Under the *Amateur Sports Act, 36 U.S.C. § 220501, et seq.*, the United States Olympic and Paralympic Committee[2] is charged with certifying a "national governing body" for each sport that is included in the Olympic and Paralympic Games. *See* *36 U.S.C. §§ 220501(b)(7)*, *220521(a)(1)*. The purpose of the governing bodies is, among other things, **[*3]** to govern participation in athletic competitions for their specific sports, including determining eligibility standards for coaches and athletes. *Id.* *§ 220523(a)*. The U.S. Soccer Federation (the parties use "USSF" to refer to the Federation) is the certified governing body for (not surprisingly) soccer. Am. Compl. ¶ 32. The USSF thus has discretion over the issuance of coaching licenses. *Id.* ¶ 33. Historically, the governing bodies of each sport were the primary handlers of allegations of misconduct amongst their members, so the USSF established bylaws to govern proceedings to address misconduct allegations. *Id.* ¶ 36.

In 2018, Congress passed the SafeSport Act to designate the Center as the "independent national safe sport organization for the United States." *36 U.S.C. § 220541(a)(1)(A)*. Under the SafeSport Act, the Center's duties include maintaining an office for investigating and resolving allegations of abuse committed against athletes. *Id.* *§ 220541(a)(1)*; Am. Compl. ¶¶ 22, 24. The Center exercises jurisdiction over the Olympic Committee and each national governing body to safeguard amateur athletes against abuse. *36 U.S.C. § 220541(a)(1)(B)*; Am. Compl. ¶ 22. Pursuant to its duties, the Center developed a Code of Conduct that outlines behaviors **[*4]** constituting an abusive act. *Id.* ¶ 20; R. 41-3, Exh. F, SafeSport Code, Article IX (Prohibited Conduct).[3] The SafeSport Act requires that the Center's investigations comport with "procedural due process," "including, at a minimum," written notice of allegations against the subjects of the investigation, the right to counsel or another advisor, the opportunity to be heard during the investigation, a written reasoned decision if a violation is found, and the ability to challenge any sanctions imposed as a result. *36 U.S.C. § 220541(a)(1)(H)*. The Act also permits the Center to use a "neutral arbitration body" to determine eligibility, *id.* *§ 220541(c)(1)*, and the Center indeed has established an arbitration process, SafeSport Code, Article XIV (Arbitration Rules). In light of the Center's designation and authority under the SafeSport Act, the Center can investigate and sanction coaches, which in turn causes national governing bodies to revoke or suspend the licenses of coaches. *See* Am. Compl. ¶ 31; SafeSport Code, Article XIII.A (Sanctions). Finally, the Act expressly says that nothing in it "shall be construed ... to give rise to a claim under State law or to create a private right of action." *36 U.S.C. § 220541(a)(2)(C)*.

---

[2] To avoid an acronym-laden opinion as much as practicable, this Opinion will refer to the Committee as the Olympic Committee, but only for clarity's sake and not to diminish the importance or skill of paralympic athletes. *Compare* 2016 Paralympic Games, 1,500-meter (T13 visual impairment) men's track gold-medal result (00:03:48.290) (available at https://www.paralympic.org/rio-2016/results/athletics/mens-1500-m-t13), *with* 2016 Olympic Games, 1,500-meter men's track gold-medal result (00:03:50.000) (available at olympics.com/en/olympic-games/rio-2016/results/athletics/1500m-men).

[3] Dames attached the 2017 version of the SafeSport Code to his amended complaint as an exhibit, R. 34-4, Exh. C, 2017 SafeSport Code. But the version of the Code that is at issue here is the 2021 version, because that was the version in place at the time that the allegations were reported to the Center. *See* R. 5-2, Exh. B, Jan. 2025 Notice at 5 (noting that the resolution procedures referenced in Dames's investigation are those "presently in effect regardless of when the incident of Prohibited Conduct occurred"). Although the complaint is generally the sole source of (alleged) facts in deciding a motion to dismiss, courts may also consider "documents referenced in the pleading if they are central to the claim." *Bogie v. Rosenberg, 705 F.3d 603, 609 (7th Cir. 2013)*; *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr., 692 F.3d 580, 591 (7th Cir. 2012)*. Dames's amended complaint references the SafeSport Code, Am. Compl. ¶¶ 18-20, and the Center includes the relevant version of the Code in its dismissal motion, so the Court will refer to the 2021 SafeSport Code as "the Code" in this Opinion.

**B. Factual Background**

Rory Dames has been a soccer coach **[*5]** for some 30 years. Am. Compl. ¶¶ 9, 14. In 2011, Dames became the coach of the Chicago Red Stars, a professional women's soccer team. *Id.* ¶ 14. To work as a professional coach, Dames had to be licensed by the USSF; he obtained that license in 2010. *Id.* ¶ 34. But in January 2022, the USSF suspended his license. *Id.* ¶ 52. One month later, the SafeSport Center sent Dames a Notice of Allegations stating that the Center was investigating allegations of misconduct spanning from 1998 to 2020. R. 38, Exh. A, Feb. 2022 Notice at 1. The Notice also said that the USSF's suspension of Dames's license was lifted, though subject to requirements (including that an adult chaperone be present when Dames was coaching). *Id.* at 2-3. The Notice went on to say that Dames could request a hearing to challenge the temporary sanctions—but Dames did not do so. *Id.* at 3; *see also* Am. Compl. ¶¶ 93-99 (acknowledging the chance to request a hearing but stating that he is not bound to that process). Pursuant to the Center's procedures, the Center posted Dames's sanctions on SafeSport's disciplinary database. Am. Compl. ¶ 59. Despite the Center's lift of the license suspension, the USSF did not reinstate Dames's license. **[*6]** *Id.* ¶ 60.

Fast forward almost three years later: in January 2025, the Center issued an updated Notice of Allegations (updated in the sense that it amended the 2022 notice). Am. Compl. ¶ 70; Jan. 2025 Notice. This time, the Center stated that it had received allegations of misconduct as to nine minor athletes and one adult athlete. Jan. 2025 Notice at 2-5. The allegations described emotional and physical misconduct that spanned from 1993 to 2018. *Id.* Moving from alleged facts to applicable standards, the Notice also said that the Center makes violation determinations using "previous standards promulgated by USSF and then-applicable existing community standards analogous to the 2021 [Center] Code, which was the Code in effect when the Center received the initial Incident Report regarding the misconduct." *Id.* at 5. For the vast majority of the allegations, the Notice acknowledged that the Center had been "unable to locate a policy which could apply to these allegations," but reserved the right to identify policy violations during the course of its proceedings. Am. Compl. ¶ 71 (quoting Jan. 2025 Notice at 2-5).

The Notice informed Dames that the next step would be for a Center investigator **[*7]** to interview him so that he might "explain [his] side of the situation, provide any information [he] may have in response to the allegations, offer names of any relevant witnesses, and to ask any questions" about the process. Jan. 2025 Notice at 5. The Notice informed Dames that he had the right to an advisor "[t]hroughout the Response & Resolution Process." *Id.* at 6. Finally, the Notice specified that Dames (and the claimant) would have two weeks to review the Center's evidence and then provide a written response with relevant supplemental information pertaining to the allegations. *Id.*

In February 2025, Dames received a second Notice of Allegations from the Center.[4] Am. Compl. ¶ 76; R. 38-3, Exh. D, Feb. 2025 Notice. This Notice set forth allegations of sexual misconduct, from around 2001 or 2002, between Dames and an adult athlete whom he coached during that time. Feb. 2025 Notice at 2. Like the January 2025 Notice, it reiterated that Dames had a right to an advisor during the process and that he would have an opportunity to review and respond to the allegations. *Id.*

In March 2025, the Center provided Dames with a 48-page statement of allegations in connection with the February Notice, **[*8]** requesting that Dames respond to the allegations within 14 days. Am. Compl. ¶ 82. One week later, the Center provided Dames with 816 pages of information as to the January Notice, again requesting that he respond within 14 days. *Id.* ¶ 83. But Dames did not respond to either request; instead, he sued the Center in Cook County Circuit Court seeking an injunction barring the Center from moving forward with the investigation and asking for a declaratory judgment that the Center has exceeded its authority, violated his "due process" rights under the SafeSport Act, and violated its own Code of Conduct. *See generally* R. 1, Exh. A, Compl.

In particular, Dames brings three claims against the Center: one claim for the alleged violation of his "fundamental rights," Am. Compl. ¶¶ 106-12; one claim for tortious interference with his rights under the USSF bylaws, *id.* ¶¶ 113-

---

[4] As a reminder, the prior notice sent in January 2025 was an amendment to the notice from 2022, so the February 2025 notice is properly considered as the second operative notice from the Center.

17; and a claim for tortious interference with his prospective business opportunities, *id.* ¶¶ 118-21. The Center removed the action to federal court under the SafeSport Act. *See* R. 1, Notice of Removal (citing *36 U.S.C. § 220541(d)(3)(A)*). The Court dismissed Dames's first complaint, holding that his claims were preempted by the Amateur Sports Act and the **[*9]** SafeSport Act. *See generally* *Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744*. Dames then filed an amended complaint, this time adding in more overt allegations that the Center's investigation failed to follow its own resolution procedures. Am. Compl. ¶ 87. The Center once again moves to dismiss Dames's claims. *See* Def.'s Mot.

**II. Legal Standard**

Under *Federal Rule of Civil Procedure 8(a)(2)*, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross, 578 F.3d 574, 580 (7th Cir. 2009)* (quoting *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*). At the same time, the Supreme Court instructs that "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task " *Iqbal, 556 U.S. at 679*. The Seventh Circuit has drawn a context-dependent distinction between relatively straightforward employment discrimination claims versus more complex claims. *Swanson v. Citibank, N.A., 614 F.3d 400, 404-05 (7th Cir. 2010)*.

"A motion under *Rule 12(b)(6)* challenges the **[*10]** sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009)*. "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal, 556 U.S. at 678* (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal, 556 U.S. at 678-79*.

**III. Analysis**

**A. Preemption**

The Center first argues that Dames's claims are preempted by the *Amateur Sports Act*, which grants "exclusive jurisdiction" to the Olympic Committee over matters regarding participation in the Olympic Games. *36 U.S.C. § 220503(3)*; *see also* Def.'s Mot. at 3-5. According to the Center, Dames's amended complaint does no more to plead around the preemption problem than his original complaint, and so the claims should be dismissed because they really are just challenges to the Center's eligibility determination. *Id.* at 3-4. The Court agrees: like his original complaint, the amended complaint is bereft of allegations that would fall within the narrow exception to the general preemption of challenges to eligibility.

As mentioned earlier, the Amateur **[*11]** Sports Act provides the Olympic Committee with exclusion jurisdiction over "all matters pertaining to United States participation in the Olympic Games." *36 U.S.C. § 220503(3)*. The Act also lists the "swift resolution of conflicts and disputes" involving athletes and national governing bodies as a purpose of the Olympic Committee. *Id.* *§ 220503(8)*. Notably, the *Amateur Sports Act* does not provide a private right of action. *See* *Michels v. U.S. Olympic Comm., 741 F.2d 155, 157 (7th Cir. 1984)* (explaining that the Act lacks

---

[5] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

an express right of action and that "[t]he legislative history of the Act clearly reveals that Congress intended not to create a private cause of action"). Thus, multiple courts—including the Seventh Circuit—have concluded that "that strict questions of athletes' eligibility are preempted by the Amateur Sports Act's grant of exclusive jurisdiction to the" Olympic Committee. *Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 595 (7th Cir. 2001)*; *see also Sanderson v. U.S. Ctr. for SafeSport, Inc., 2021 U.S. Dist. LEXIS 141465, 2021 WL 3206322, at *3 (D. Colo. July 29, 2021)* (collecting cases).

Congress then passed the SafeSport Act in 2018, designating the Center as the independent organization with "jurisdiction over the corporation"—meaning the Olympic Committee—and over each national governing body "with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse." *36 U.S.C. § 220541(a)(1)(B)*. Remember that *Slaney* considered only the pre-2018 **[*12]** Amateur Sports Act and thus did not pass on the existence of the Center or its jurisdiction. *See generally Slaney, 244 F.3d 580*. But the Center's "jurisdiction *over*" the Olympic Committee for matters pertaining to allegations of abuse must, in turn, mean that the Center's eligibility determinations—like the Olympic Committee's—cannot be questioned in federal court. *36 U.S.C. § 220541(a)(1)(B)* (emphasis added); *see also Callaghan v. U.S. Ctr. for Safe Sport, 2018 U.S. Dist. LEXIS 147066, 2018 WL 4107951, at *5 (M.D. Fla. Aug. 29, 2018)* (holding that the Olympic Committee's exclusive jurisdiction under the Amateur Sports Act, paired with the Center's exclusive authority over the Committee for investigations into abuse, implies that a plaintiff must raise his claims via the Center's arbitrative process). The SafeSport Act goes on to further clarify this ban against eligibility challenges by warning that "[n]othing in this subsection shall be construed ... to give rise to a claim under State law or to create a private right of action." *36 U.S.C. § 220541(a)(2)(C)*. Finally, the Act has a "Limitation on Liability" instruction again confirming that "[n]othing in this chapter shall be construed to create a private right of action." *Id. § 220541(d)(3)(B)*. So there is a general preemption of challenges of eligibility determinations made by the Center or the member organizations of the Olympic Committee. **[*13]** [6]

Dames disagrees, arguing that only disputes over the eligibility determinations made by the Olympic Committee or the National Governing Bodies are preempted. Pl.'s Resp. at 7. To Dames's way of thinking, the Center is not a member of the Olympic Committee and so the Amateur Sports Act's exclusive jurisdiction grant does not apply to it. *Id.* He goes on to argue that the SafeSport Act's "limitation on liability" and removal provisions "clearly contemplate[] that state law claims may be brought against" the Center. *Id.* at 8 (citing *§ 220541(d)*). To be sure, the Court agrees that of course *some* plaintiffs may sue the Center in federal court for noneligibility-related disputes. Take, for example, a vendor suing the Center for a breach of contract claim: that claim could be removed by the Center to federal court (if diversity jurisdiction applied) and would face no bar against challenges to an eligibility determination. Claims involving eligibility determinations, by contrast, fall within the Amateur Sports Act's exclusive jurisdictional grant, and the Center's exercise of jurisdiction *over* the Olympic Committee means that its eligibility determinations also fall **[*14]** within the exclusive jurisdiction grant.

But the analysis does not end there: in assessing the pre-2018 Amateur Sports Act, the Seventh Circuit recognized an exception to the general preemption. "While there is no dispute that the [Olympic Committee] has exclusive jurisdiction when it comes to eligibility determinations, the courts can still play a role in ensuring that the organization follows its rules for determining eligibility." *Slaney, 244 F.3d at 595*. The court went on to discuss two district court cases holding that plaintiffs alleging that organizations within the Olympic Committee umbrella "contravened [their] own rules" were not preempted. *Id.* (first citing *Foschi by Foschi v. U.S. Swimming Inc., 916 F. Supp. 232, 237 (E.D.N.Y. 1996)*; and then citing *Harding v. U.S. Figure Skating Ass'n, 851 F. Supp. 1476, 1479 (D.*

---

[6] Dames contends that this Court's prior Opinion misdescribed the district court's conclusion in *Navarro v. United States Ctr. for SafeSport, 2025 U.S. Dist. LEXIS 7929, 2025 WL 209166, at *9-10 (W.D. Va. Jan. 15, 2025)*. *See* R. 45, Pl.'s Resp. at 7 n.2 (citing *Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *5*). The Court recognizes that of course the court in *Navarro* came out the other way, concluding that the Amateur Sports Act did not deprive federal courts of jurisdiction over the eligibility-related claims in that case. *Navarro, 2025 U.S. Dist. LEXIS 7929, 2025 WL 209166, at *9-10*. The prior Opinion cited *Navarro* only and specifically because it helpfully compiles the several other cases—including *Slaney*—that have considered this issue and concluded that the Act does in fact preempt eligibility-based claims. *See 2025 U.S. Dist. LEXIS 7929, [WL] at *8*; *see also Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *5* (citing *Navarro* for its "collecti[on of] cases").

Or. 1994), *vacated on other grounds*, 879 F. Supp. 1053 (D. Or. 1995)). The courts there noted that "this limited exception" is to be used "only in the most extraordinary circumstances, where the association has clearly breached its own rules, that breach will imminently result in *serious* and irreparable harm to the plaintiff, and the plaintiff has exhausted all internal remedies." *Id.* (cleaned up). So the operative inquiry in determining whether this Court may hear Dames's claims against the Center is whether those claims are "tort claims in name only" that really **[*15]** seek to challenge an eligibility determination, or whether they present only allegations that the Center has breached its *own* rules for investigating abuse. *See* Sanderson, 2021 U.S. Dist. LEXIS 141465, 2021 WL 320622, at *4.

Dames argues—as he did in defense of his original complaint—that his claims "are not a private right of action challenging an eligibility determination" by the Center. Pl.'s Resp. at 8 n.3, 9 n.4; *see also* R. 17-1, Pl.'s Prelim. Injunction Reply at 8-16 (arguing that Dames's claims fall within the exception identified in Slaney because they allege that the Center's Code violates the due process requirements under the Acts). But Dames's amended complaint, like his first one, is devoid of any factual allegations that the Center has violated its own *internal* rules. His claims for relief are virtually identical to the ones in his original complaint. *Compare* Am. Compl. ¶¶ 106-121, *with* Compl. ¶¶ 80-95. As explained in the prior Opinion, his due process claim does not actually accuse the Center of violating its own rules; instead, it challenges the Center's decision-making authority on eligibility. *See* Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *6. And Dames's two tortious-interference claims are premised on the contention that the Center cannot investigate conduct before the SafeSport **[*16]** Act's passage, Am. Compl. at 25-29, which amounts to a dispute about what the Center may consider in its eligibility determinations, *see* Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *6. None of these claims are ones that the Center violated its own rules, so they are preempted.

It is true that elsewhere in the amended complaint, Dames added allegations that "[d]uring the course its investigation of Dames, SafeSport violated its internal policies and procedures," including by investigating allegations involving professional players outside of the Center's jurisdiction, failing to close its 2022 investigations, reopening its investigation in 2024, and generally investigating conduct that did not violate then-established standards. Am. Compl. ¶ 87. But merely adding the preamble that the Center violated its own rules—without editing the substance of the factual allegations that follow—is not enough to plausibly state a claim that falls under the limited exception to preemption. Dames identifies no specific Center rules that the Center's investigation supposedly violated; instead, he alleges that the Center is violating the Acts themselves by operating outside of their jurisdictional grants. *See id.* ¶¶ 79-81, 87. In the earlier Opinion, **[*17]** the Court explained that Dames's claims—that the Center (1) was investigating conduct that predated the SafeSport Act; and (2) did not identify a policy to apply to the allegations but refused to dismiss the investigation—are actually claims that the Center is violating federal law.[7] Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *6. That is different from the class of claims recognized in Slaney. 2025 U.S. Dist. LEXIS 87124, [WL] at *6 & n.5; *see also* Slaney, 244 F.3d at 595-96 (recognizing a "limited exception" to the preemption for federal courts to "examin[e] whether *internal* rules had been complied with" (emphasis added)); Sanderson, 2021 U.S. Dist. LEXIS 141465, 2021 WL 3206322, at *3 (explaining that the Amateur Sports Act "does not create a private right of action"). So too with Dames's allegation that the Center cannot investigate him under the SafeSport Act without a written request from USSF or the Olympic Committee. Am. Compl. ¶ 87(E).

The closest that Dames comes to alleging that the Center actually violated its *own* internal procedures are his assertions that (1) the Center failed to notify USSF that it was exercising discretionary jurisdiction over his case, and (2) investigated conduct that did not violate the Center's Code. Am. Compl. ¶ 87(F)-(G). But again, Dames does not do more to allege *how* these practices violate the Code; in fact, his response brief **[*18]** only muddies the water further by arguing that his claims are actually "cognizable based on Supreme Court precedent" rather than explaining which Code provisions were violated. Pl.'s Resp. at 17-18. The Court will address the merits of Dames's Supreme Court common law argument (if that is what it is) later in this Opinion. For now, it is enough to note that the Code does not *require* the Center to notify USSF of its decision to exercise discretionary authority; it only states that the Center "will notify the relevant [national governing body], or the [Olympic Committee]" when it initiates

---

[7] Dames's allegation that the Center is improperly investigating conduct involving professional players also falls within the bucket of allegations that actually challenge the Center's eligibility decision-making processes.

proceedings. SafeSport Code at 21.[8] And the Center's Code explicitly states that "[p]rior or subsequent conduct" of participants "may be considered for any purpose ... regardless of whether there has been a prior finding of a Code violation." *Id.* at 25. So the Center's consideration of past allegations (with or without the label of "Code violation") is explicitly permitted under the Code.[9] At bottom, Dames cannot merely plead around the Acts' preemption by adding magic words before factual allegations that—if true—would not amount to a violation of the Center's procedures.

All three of Dames's claims are preempted by the **[*19]** Amateur Sports Act and the SafeSport Act, so Dames must arbitrate them through the process provided by the Center.

**B. Arbitration**

Dames argues that he is not required to submit to the Center's arbitrative process because he has not agreed to arbitrate his issues. Pl.'s Resp. at 9-16. The Center argues that, by applying for and holding a USSF license, Dames is bound by the Center's Code and thus has agreed to arbitrate. Def.'s Mot. at 5-8. The Court agrees: as a participant in USSF, the Code's arbitration requirements apply to him.

To start, the Court looks to the Code's definition of participant: "Any individual who is seeking to be, currently is, or was at the time of an alleged Code violation ... [a] member or license holder of" a national governing body. SafeSport Code at 6. Whether or not someone is a "participant" under the Code is important, because "[t]he Code applies to Participants ...." *Id.* at 1. Also, "[e]ach Participant, by virtue of membership, affiliation, or participation ... agrees to abide by and be subject to [the Code's] Arbitration Rules as the sole and exclusive method of resolving any challenge to the Center's eligibility decision(s) or the Center's processes." *Id.* at 30. Thus, if **[*20]** Dames is a participant, then he must arbitrate his claims.

As explained earlier, USSF is the certified governing body for the sport of soccer. Am. Compl. ¶ 32. The amended complaint alleges that Dames was licensed by USSF from 2010 until about December 2021. *Id.* ¶ 34. It also alleges that the Center's "delay in closing its investigation ... impede[s] his ability to have USSF lift[] its suspension of his coaching license," thereby preventing Dames from coaching club soccer. *Id.* ¶ 104; *see also id.* ¶¶ 115, 119-21 (alleging that USSF will not lift the suspension of his license until the Center's investigation is closed, so Dames cannot coach teams overseen by U.S. Club Soccer or earn a living in the interim). Thus, it is beyond dispute that Dames previously was—and currently seeks to be—a license holder of a national governing body. Dames is a participant, and he is bound by the Code's arbitration rules.

Aside from arguing that "[t]he mere fact that Dames is licensed by USSF or that he participates in IYSA does not bind him to the SafeSport Code," Dames only counters that "[n]othing in his application for a USSF license required him to arbitrate ...." Pl.'s Resp. at 11-12. According to **[*21]** Dames, the Center may not "unilaterally place[] in its own Code" a definition binding him to the Code because arbitration agreements require mutual assent. *Id.* at 12. But the SafeSport Act explicitly empowers the Center to (1) "develop ... oversight practices, policies, and procedures to prevent the abuse ... of amateur athletes" and (2) "maintain an office for *response and resolution* that shall establish mechanisms that allow for the reporting, investigation, and resolution ... of alleged sexual abuse in violation of the Center's policies and procedures." *36 U.S.C. § 220541(a)* (emphasis added). The Center executed these duties by enacting the Code, which sets up procedures to investigate and resolve abuse allegations of participants. And the Center chose to use arbitration for resolving disputes as permitted by the SafeSport Act, which states that all actions by the Center provide "the ability to challenge, in a hearing or through arbitration, interim

---

[8] The Court notes that Dames's allegations in the amended complaint could also be read as contradicting his assertion that the Center never notified USSF of its decision to investigate Dames, because he claims that the Center notified Dames of the investigation and lifted USSF's sanctions of him on the same day. Am. Compl. ¶¶ 54, 59. So there are no clear allegations that USSF did not receive notification of the Center's investigation, and at the very least, there are allegations that the Center and USSF were already in communication about Dames by the time Dames was made aware of the Center's investigation at all.

[9] Even if the Code did not clearly permit the consideration of past conduct regardless of Code-violation status, the Court may hesitate to venture into this type of claim because it necessarily involves an inquiry into how the Center determines eligibility.

measures or sanctions," and allows the Center to "utilize a neutral arbitration body ...." *Id.* § 220541(a)(1)(H)(v), (c)(1). In other words, Congress explicitly empowered the Center to create its Code and build an arbitrative process for abuse disputes. By continuing to seek participation **[*22]** in USSF as a coach, Dames agreed to arbitration.[10]

Any remaining uncertainty about whether Dames can plausibly allege that he never agreed to arbitrate his eligibility-related disputes with the Center is further dispelled by the fact that Dames filled out a background form as part of his license application in 2021 agreeing "to the reporting requirement and resolution procedures set forth in the SafeSport Code." R. 41-2, Exh. E, License App. at 5. Dames argues that he was not on notice of this language in the form because it is "buried at the end of a footnote" of a multi-page document. Pl.'s Resp. at 13. He also argues that the Court cannot properly consider the document in its decision because it has not been authenticated and the Center has not demonstrated that the entities associated with that form "had any authority to bind Dames to any SafeSport arbitration." *Id.* at 13 n.7. But as the Court already explained, it may consider documents referenced in the pleading when they are central to the claim. *See* Bogie, 705 F.3d at 609. The amended complaint alleges that he "never executed any document issued by USSF or SafeSport that incorporated the arbitration provisions of the SafeSport Code," Am. Compl. **[*23]** ¶ 96, which is more or less a reference to this background form (which is a document executed by Dames referencing the Code's resolution rules). Dames does not dispute that he executed the background document; only that it has not been authenticated and that the notice was not clear enough. So, although the Center did not *need* to dig up the background form to dispel Dames's claims that he never agreed to arbitrate—as explained, his status as a participant would have been sufficient—the Court is permitted to consider the document and it only further undercuts Dames's claims.

Dames's next line of argument asserts that the Center is not permitted to require arbitration for certain types of conduct, and also that the claims in the amended complaint cannot be raised in arbitration under the Center's rules. Pl.'s Resp. at 10, 15. On the first point, Dames misreads the SafeSport Act's language. Yes, it states that the Center may "utilize a neutral arbitration body ... to resolve allegations of sexual abuse within its jurisdiction ...." 36 U.S.C. § 220541(c)(1). But that does not supply a negative inference that the Center *cannot* require arbitration for non-sexual abuse allegations; only that Congress specifically **[*24]** chose to clarify that sexual-abuse allegations may be arbitrated. The Act never disallows arbitration in any context and elsewhere uses arbitration interchangeably with the word "hearing." *See id.* § 220541(a)(1)(H)(v), (a)(2)(A). On the second point, Dames acknowledges that the Center's "Code does permit [Dames] to raise certain due process challenges relating to protections provided in the SafeSport Act ...." Pl.'s Resp. at 15. Indeed, the Code states that respondents can raise claims that the Center has violated the procedural due process protections required by the SafeSport Act "before the arbitrator ...." SafeSport Code at 33. Still, Dames argues that the Code does not allow him to arbitrate his claim that the Center is operating outside of its jurisdiction. Pl.'s Resp. at 15. The Court already explained that Dames's allegations that the Center cannot investigate certain conduct is really "a challenge as to what the Center may consider when making its eligibility determinations." Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *6.

Having concluded that Dames is bound by the SafeSport Code by virtue of his status as a participant, he must arbitrate his claims.

### C. Sufficiency of the Allegations

Even if Dames could bring his claims in federal court without exhausting his arbitrative **[*25]** remedies, the claims are meritless. As noted earlier, Dames's three claims directly mirror the claims from his first complaint. *Compare* Am. Compl. ¶¶ 106-121, *with* Compl. ¶¶ 80-95. The prior Opinion explained the ways in which Dames's own due-process claim fails to allege that the Center's rules are inconsistent with the SafeSport Act.[11] To recap, the

---

[10] Dames must also arbitrate the issue of whether there is a valid agreement to arbitrate. *See* SafeSport Code at 31 ("The arbitrator shall have the power to rule on the arbitration body's jurisdiction, including any objections with respect to the existence, scope or validity of the Arbitration agreement.").

SafeSport Act requires that respondents be provided with: (1) written notice of the allegations against them; (2) the right to be represented by counsel or an advisor; (3) opportunity to be heard during the investigation; (4) reasoned written decision if the Center finds a violation of its Code; and (5) the ability to challenge (in a hearing or in an arbitration) any interim sanctions imposed by the Center. 36 U.S.C. § 220541(a)(1)(H)(i)-(v). The amended complaint alleges facts that meet these requirements,[12] namely:

• The Center provided Dames with three Notices of Allegations specifying the year (or range of years) that the alleged violations took place, the initials of the athletes' names that he allegedly abused, and the general nature of the allegations. *See* Am. Compl. ¶¶ 54, 70, 76; Feb. 2022 Notice; Jan. 2025 Notice; Feb. 2025 Notice.

• Dames was given hundreds of pages **[*26]** containing the statements and complaints upon which the Center was acting and provided time to respond and supply additional pertinent information. Am. Compl. ¶¶ 82-83.

• The Notices informed Dames of his right to an advisor that may accompany him at any proceedings related to the investigation process. *See* Jan. 2025 Notice at 6; Feb. 2025 Notice at 2.

• The Notices specified that the next step would be to submit to an interview where he could "explain [his] side of the situation, provide any information [he] may have in response to the allegations, offer names of any relevant witnesses," and ask questions about the process. Jan. 2025 Notice at 5; Feb. 2025 Notice at 2.[13]

• Finally, when the Center imposed temporary sanctions on Dames in 2022, he was given a right to a "temporary measures hearing" where he could "contest the imposition of those measures." Feb. 2022 Notice at 3.

Thus, Dames has failed to allege a viable statutory due-process claim against the Center's procedures, so his claim would be dismissed in any case. In a final attempt to defeat dismissal, Dames asserts that his claims "are cognizable based on Supreme Court precedent." Pl.'s Resp. at 17. It is not entirely **[*27]** clear to the Court how, exactly, Supreme Court precedent supports his position. Indeed, Dames cites no case law pertaining to the Amateur Sports Act or the SafeSport Act in that portion of his briefing. *Id.* at 17-18. The Supreme Court's precedent does not create a free-floating, common law cause of action to be used against regulators or entities, especially when the statute designating the entity at issue explicitly disclaims the creation of a private right of action. So Dames's claims would be dismissed even if this Court were able to consider them before the arbitration process.

---

[11] This section only substantively considers the statutory due-process claim and the tortious-interference claim about a predetermination hearing. This is because there can be no argument that his tortious-interference claim about business opportunities is anything other than a challenge to the Center's eligibility determination. Am. Compl. ¶¶ 118-121. There, Dames alleges that he "cannot coach teams that play tournaments overseen by US Club Soccer or the Illinois Youth Soccer Association" without his coaching license, and so the investigation is preventing him from earning a living. *Id.* ¶¶ 120-21. Thus, he is directly challenging the Center's eligibility-determination process that caused the license suspension, which is surely preempted by the Amateur Sports Act.

[12] As was the case at the time of the Court's prior Opinion, the Center has not found a violation and so the "reasoned written decision" requirement has not been triggered. *Id.* § 220541(a)(1)(H)(iv).

[13] Dames alleges that he was entitled to a predetermination hearing in front of a neutral decisionmaker before the Center imposed any sanctions. Am. Compl. ¶¶ 92, 113-17. But the SafeSport Act clearly states that "[n]othing in this subsection shall be construed ... to preclude the Center from imposing interim measures or sanctions on an individual *before* an opportunity for a hearing or arbitration." § 220541(a)(2)(A) (emphasis added). So Dames's argument is legally flawed. The prior Opinion explained that the Amateur Sports Act's requirement that governing bodies provide a predetermination hearing applies only to governing bodies. *Dames, 2025 U.S. Dist. LEXIS 87124, 2025 WL 1331744, at *8 n.8*. The Center is explicitly exempted from that requirement under the SafeSport Act.

**IV. Conclusion**

The Center's motion to dismiss, R. 41, is granted. The amended complaint is dismissed. This time, the dismissal is with prejudice. Dames has already had an opportunity to amend the complaint once and had the benefit of a prior round dismissal briefing and the Court's Opinion explaining the preemption and exhaustion issues. So final judgment shall be entered.

ENTERED:

/s/ Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge

DATE: January 5, 2026

---

End of Document